**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**PARKERSBURG**

**RHONDA SUE GALYEAN,**

       **Plaintiff,**

**v.**                           **CASE NO. 6:11-cv-00590**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

       **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433.  This case was referred to this United States Magistrate Judge by standing order to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).

Plaintiff, Rhonda Sue Galyean (hereinafter referred to as "Claimant"), filed an application for DIB on May 1, 2009, alleging disability as of April 15, 2009, due to undifferentiated connective tissue disease, systemic lupus erythematosus, and antiphospholipid antibody syndrome.  (Tr. at 12, 108-110, 131-41, 166-72, 184-89.)  The claim was denied initially and upon reconsideration.  (Tr. at 12, 51-55, 57-59.)  On August 14, 2009, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 62-63.)  The video hearing was held on May 24, 2010 before the Honorable Thomas W. Erwin.  (Tr. at 22-48, 71-77, 78-87, 100-101.)  By decision dated June 4, 2010, the ALJ

determined that Claimant was not entitled to benefits.  (Tr. at 12-21.)  The ALJ's decision became the final decision of the Commissioner on July 6, 2011, when the Appeals Council denied Claimant's request for review.  (Tr. at 1-5.)  On August 30, 2011, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 404.1520 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 404.1520(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. § 404.1520(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. § 404.1520(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. § 404.1520(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d

866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(f) (2002). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 14.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of connective tissue disorder, lupus, arthralgias, status post abscessed cellulitis, and obesity.  (Tr. at 14-17.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 17-18.)  The ALJ then found that Claimant has a residual functional capacity for sedentary work, reduced by nonexertional limitations.  (Tr. at 18-20.)  As a result, Claimant can return to her past relevant work as a customer service representative. (Tr. at 21.)  On this basis, benefits were denied.  (Tr. at 21.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.   In Blalock v. Richardson, substantial evidence was defined as

"evidence which a reasoning mind would accept as sufficient to

> support a particular conclusion. It consists of more than a mere
> scintilla of evidence but may be somewhat less than a
> preponderance. If there is evidence to justify a refusal to direct
> a verdict were the case before a jury, then there is 'substantial
> evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner in this case is supported by substantial evidence.

Claimant's Background

Claimant was 49 years old at the time of the administrative hearing.  (Tr. at 28.)  She has a high school education and two years of college education.  (Tr. at 28.)  In the past, she worked as a secretary for a federal agency, a hospital, and a church. (Tr. at 29-30.) She also worked as a health insurance plan customer service representative for a hospital. (Tr. at 30.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below:

Physical Evidence

On January 8, 2008, Claimant was admitted to St. Joseph's Hospital with complaints of abdominal pain due to "[a]nterior abdominal wall fluid collection."  (Tr. at

201.) She was diagnosed with "1.  Cellulitis; 2.  Allergic rhinitis; 3.  Obesity."  (Tr. at 200.)

Michael Roberts, M.D. noted:

> This 46-year-old obese white female is approximately two and a half years status post repair of lower abdominal midline ventral hernia with mesh...
>
> I discussed with the patient that it is very possible the mesh could be infected. This also could just be a chronic seroma which became infected with the omphalitis process as well.  In any case, we will continue to drain catheter for now, IV antibiotics, and we will reassess CT scan in 72 hours.  We did discuss potential for mesh infection as well as its potential removal in the future.  We also discussed potential for treatment of this process with antibiotics alone as well.

(Tr. at 201-02.)

On January 12, 2008, Claimant was discharged from St. Joseph's Hospital with these comments by Heather D. Straight, D.O.:

> The patient did very well, abscessed cellulitis area was drained by radiology, antibiotics were continued.  The patient improved symptomatically.  She is stable for discharge today, diet and activity as tolerated.  Resume home medications, resume current antibiotics, prescriptions attached.  Follow up in the office in two to four weeks, earlier if needed.

Id.

On February 25, 2008, Claimant was treated at St. Joseph's Hospital Emergency Department for pain and edema.  (Tr. at 241-42.)

On May 29, 2008, June 18, 2008, September 29, 2008 and March 31, 2009, Gurpreet S. Brar, M.D., a rheumatologist, treated Claimant for joint pain, inflammatory arthritis, and undifferentiated connective tissue disease.  (Tr. at 213-18, 289.)  On the most recent visit, March 31, 2009, Dr. Brar noted: "Patient has done well from a rheumatologic standpoint since the last visit...Co-morbid Conditions: Anti-Photospholipid antibody syndrome."  (Tr. at 215, 289.)  Dr. Brar found Claimant's cervical, lumbar, thoracic spine,

wrists, elbows, shoulders, knees, ankles, hips, and functional status to be normal and that she did not have tender or swollen joints.  Id.

On May 31, 2008 Dr. Brar ordered X-rays of Claimant's hands and wrists for evaluation of arthritic process.  Philip H. Strobl, M.D. reviewed the series and concluded:

> Impression:
> 1. No evidence of an acute fracture or definite erosive arthropathy.
> 2. Slight narrowing of the interphalangeal joints bilaterally suggesting mild osteoarthritis.
> 3. There is a slight periarticular osteopenia.  This can be an early sign of rheumatoid arthritis although no definite erosions are seen at this time.

(Tr. at 226-27, 236-37.)

On June 21, 2008, Claimant was treated at St. Joseph's Hospital Emergency Department for pain and diagnosed with "cellulitis of abd [abdominal] wall."  (Tr. at 243-44.)

On June 27, 2008, Claimant had an abdominal and pelvis CT with contrast at St. Joseph's Hospital.  Philip H. Strobl, M.D. stated:

> Followup intra-abdominal abscess he [sic, she] is 3 previous ventral hernia repair...Comparison is made with prior abdominal CT of 1/11/2008...
> Impression:
> 1. Postoperative changes following previous ventral hernia repair in the lower abdomen.  There is a complex septated fluid collection within the anterior abdominal wall just left of midline in the upper pelvis or lower abdomen. This has decreased in size since the prior CT of 1/11/2008 and currently measures approximately 6.3 cm x 2.4 cm x 3.5 cm.  There are at least 2 other smaller collections more anteriorly and inferiorly in the subcutaneous fat of lower abdominal wall just to the right [of] the midline.  The smaller collections may have progressed slightly since the prior CT.
> [No number 2 listed.]
> 3. No evidence of bowel obstruction or intra-abdominal inflammation.
> 4. Very mild fatty infiltration of the liver.

(Tr. at 234-35.)

On September 29, 2008 and March 31, 2009, Claimant was treated by Michael A.

Wanchick, M.D., an ophthalmologist.   (Tr. at 206-07.) On the most recent visit, Dr.

Wanchick noted: "No problems - didn't get bifocal in glasses...VA; OD 20/20-1; OS 20/20-

1." (Tr. at 207.)

On March 30, 2009, Claimant was treated at St. Joseph's Hospital Emergency

Department for chest pain.  (Tr. at 232.) Keith A. Waggoner, M.D., stated:

> I have a low index of suspicion for this being cardiac.  Her gallbladder needs
> to be looked at and I have ordered an outpatient slip for that.  She has been
> having pain constantly since yesterday morning.  We would have some EKG
> changes and enzyme changes at this point if this were cardiac.

(Tr. at 232-33.)

On March 30, 2009, Claimant had a chest CT with contrast  performed at St.

Joseph's Hospital. Peter W. Strobl, M.D., concluded:

> Impression:
> 1.  Limited study due to respiratory motion artifact.
> 2.  Moderate cardiomegaly.
> 3.  Small pericardial effusion.
> 4.  No gross evidence of pulmonary embolus or worrisome     parenchymal
> mass.
> 5.  Mild bibasilar atelectasis.
> 6.  Suspected fatty infiltration of the liver.

(Tr. at 246.)

On April 10, 2009, Claimant had an ultrasound of her gallbladder, liver and pancreas

at St. Joseph's Hospital due to chest pain with nausea and vomiting.  (Tr. at 252.)  Peter W.

Strobl, M.D. stated:

> Impression:
> 1.      Billary sludge without secondary signs of          cholecystitis.
> 2.      No evidence of significant billary ductal dilation.
> 3.      Grossly unremarkable evaluation of the liver.

Id.

On April 14, 2009, Claimant was treated at Ohio Valley Medical Quick Care, Inc. (Tr. at 228-30.) Although the handwritten notes are largely illegible, the words "[f]ever - low grade X 12 days, gets flushed/sweats, chills, nausea X 3" are legible. (Tr. at 229.)

On May 13, 2009, Heather Straight, D.O., Mid-Ohio Valley Medical Group, Inc., followed up with Claimant following an emergency room visit. (Tr. at 248, 290.) She noted weight to be 254 pounds and concluded:

> ASSESSMENT/PLAN:
> 278.00 - OBESITY UNSPECIFIED
>     ASSESSMENT: The patient notes a weight gain. Weight loss has been strongly encouraged by following dietary restrictions and an exercise routine.
> 710.8 - OTH SPEC DIF DSRD CONNECTIVE TIS
>     ASSESSMENT: Unchanged. Will continue to follow with Dr. Brar.
> 311 - DEPRESSION NOS [not otherwise specified]
>     ASSESSMENT: The patient's depression is worsening. Will start medication for better control.
>     MEDICATIONS:
>     CYMBALTA ORAL CAPSULE ENTERIC COATED 30 MG, 1 every day, 7 duration/days supply, 7 samples given, status; NEW PRESCRIPTION, 05/13/2009.
>     CYMBALTA ORAL CAPSULE ENTERIC COATED 60 MG, 1 every day, 42 dispensed, 42 samples given, status: NEW PRESCRIPTIONS, 05/13/2009.
> PREVENTIVE COUNSELING: The patient was counseled.
> RETURN VISIT: Patient instructed to return in 3 months. Instructed to call if not improving. Patient is to return on an as needed basis.

(Tr. at 249-50, 291-92.)

On May 27, 2009, a State agency medical source completed a Physical Residual Functional Capacity [RFC] Assessment form. (Tr. at 253-60.) The evaluator, Thomas Lauderman, D.O., stated that Claimant's primary diagnosis is Systemic Lupus Erythematosus. (Tr. at 253.) He opined that Claimant could perform medium work without postural, manipulative, visual, communicative, or environmental limitations. (Tr. at 255-57.) Dr. Lauderman commented:

Takes kids to school sometimes.  Depending on pain level she may dust and do dishes.  She is able to prepare her own meals.  She reports sometimes needing help with socks, shoes, and buttoning clothing.  Sometimes the pain in her hands prevents her from washing/drying hair.  Shops for groceries.  States she can only lift 5 lbs., can only walk 1 block before needing rest.  No assistive devices needed to ambulate...

03/31/09 (Dr. Brar) - Dx: undifferentiated connective tissue disease, currently stable.  Pt has done well from a rheumatologic standpoint since last visit.  Cervical, lumbar, thoracic spine = normal.  Wrists, elbows, shoulders, knees, ankles, hips = normal.  No tender or swollen joints.  Functional status is normal.  Clmt [claimant] also saw Dr. Brar on 09/29/2008 - at that time her connective tissue disease was also well controlled, and clmt had an essentially normal exam.  Clmt is partially credible since the ADL and the above physical exams do not substantiate clmt's complaints fully.

(Tr. at 258-60.)

On June 11, 2009, Dr. Brar marked a form noting that Claimant had "Normal" musculoskeletal gait and station, fine motor ability, gross motor ability, joints and muscle bulk. (Tr. at 210.)

On July 29, 2009, a State agency medical source completed a Physical Residual Functional Capacity [RFC] Assessment form.  (Tr. at 261-68.)  The evaluator, Fulvio Franyutti, M.D., stated: "Primary Diagnosis: Und. C.T. [undifferentiated connective tissue] Disease. Secondary Diagnosis: Arthralgias.  Other Alleged Impairments: Obesity.  Pain Stiffness of joint."  (Tr. at 261.)  He opined that Claimant could perform light work without manipulative, visual, or communicative limitations.  (Tr. at 263-64.)  He found her to be without environmental limitations save to avoid concentrated exposure to extreme temperatures and hazards.  (Tr. at 265.)  She was found to be able to do all postural limitations occasionally save climbing ladder/rope/scaffolds, which he opined Claimant could not do. (Tr. at 263.)  Dr. Franyutti commented: "ADLs partially supported by findings.  Claimant considered partially credible."  (Tr. at 266.)

9

On August 13, 2009, Heather Straight, D.O., Mid-Ohio Valley Medical Group, Inc., stated that Claimant had a follow-up evaluation.  (Tr. at 293.)  She found:

> The patient remains overweight.  The patient has not had any significant weight loss to date.  Weight loss has been strongly encouraged by following dietary restrictions and an exercise routine...
>
> The patient's depression has improved.  Will not change medication, continue to monitor for complications....
>
> Patient instructed to return in 6 months.  Instructed to call if not improving.  Patient is to return on an as needed basis.

(Tr. at 295.)

On February 17, 2010, Dr. Straight stated that Claimant had a follow-up evaluation.

(Tr. at 296.)  She found:

> The patient remains overweight.  The patient has not had any significant weight loss to date.  Weight loss has been strongly encouraged by following dietary restrictions and an exercise routine...
>
> The patient's depression has improved.  Will not change medication, continue to monitor for complications....
>
> Patient instructed to return in 6 months.  Instructed to call if not improving.  Patient is to return on an as needed basis.

(Tr. at 298.)

On April 6, 2010, Dr. Brar stated that Claimant was "being seen in follow-up for undifferentiated connected tissue disease with elevated Anti-smith antibody and Anti-histone antibody, past history of Anti-Phospholipid antibody syndrome." (Tr. at 288, 299.)  He opined that Claimant "has not done as well from a rheumatologic standpoint since the last visit.  Morning stiffness is one hour.  Target joints are hands.  Activities of daily living are normal." Id.  Dr. Brar noted Claimant's cervical, lumbar, thoracic spine, wrists, elbows, shoulders, knees, ankles, hips, and functional status to be normal and that she did not have

tender or swollen joints. Id.

Psychiatric Evidence

On August 3, 2009, a State agency medical source completed a Psychiatric Review Technique form. (Tr. at 269-82.) The evaluator, Bob Marinelli, Ed.D., found that Claimant's affective disorder (depression) impairment was not severe. (Tr. at 269, 282.) Dr. Marinelli stated that Claimant's degree of limitation was mild in the areas of restriction of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace, and that she had no episodes of decompensation, each of extended duration. (Tr. at 279.) The evidence did not establish the presence of the "C" criteria. (Tr. at 280.) Dr. Marinelli commented:

> The clmt's ADLs above dated 6/14/09 do not indicate a severe affect of the depression. She completed ADLs on her own, submitted remarks for claim concerning meds...There does not appear to be a severe or marked affect on her ability to function. Claimant's reported Y allegations appear consistent w/ MER [medical evidence of record] & appear credible.

(Tr. at 281.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the record does not support a finding that the claimant can perform sustained work activities. (Pl.'s Br. at 2-5.) Specifically, Claimant argues:

> The ALJ found "the claimant is capable of performing past relevant work as a customer service representative. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity" (Transcript pg. 21). However, the Plaintiff asserted that her work as a customer service representative required her to "take calls from employees regarding their health care plan. Enter claims into the system when not taking calls. I used a head set on the phone and a computer" (Transcript pg. 144). The Plaintiff stated that she sat about 6 hours of the day, and walked and stood about 30 minutes each (Transcript pg. 144). She

stated that she was required to handle, grab or grasp big objects 6 hours each day, and write, type, or handle small objects 6 hours each day (Transcript pg. 144).

The ALJ did not differentiate between how the Plaintiff performed the job and how the job is performed in the national economy in the hearing, nor in the decision.  Also, although the VE testified that the customer service job required occasional handling, fingering and feeling, according to the DOT, an insurance clerk customer service representative (DOT 219.387-014) is a sedentary position with frequent reaching, handling, and fingering.  Additionally, a benefits clerk customer service representative (DOT 205.567-010) is a sedentary position with frequent reaching, handling, and fingering.

Notably, according to SSR 85-15, "reaching, handling, fingering, and feeling require progressively finer usage of the upper extremities to perform work-related activities.  Reaching and handling are activities required in almost all jobs.  Significant limitations of reaching and handling may eliminate a large number of occupations a person could otherwise do."  SSR 83-10 states, "most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions."  The only testimony taken by the Plaintiff regarding her past work as a customer service representative was when the Plaintiff stated "I took phone calls from employees of the Cleveland Clinic about their health insurance plan" (Transcript pg. 30).  The vocational expert stated that she had enough information to classify the past work, but then incorrectly stated that it only required occasionally reaching, handling, and fingering (Transcript pg. 45).

Additionally, the vocational expert did not provide a DOT code with her analysis of the customer service representative position.  Without a <u>DOT</u> code, it is impossible to know whether there is a conflict with the vocational expert's testimony and the <u>DOT</u>.  Clearly, both an insurance clerk and benefits clerk require frequent reaching, handling, and fingering according to the <u>DOT</u>.  This information is in direct conflict with the vocational expert's testimony regarding the Plaintiff's past work.  It is clear based on the record as a whole, the Plaintiff's testimony, and the <u>DOT</u>, that the Plaintiff cannot perform her past work.  The ALJ did not ask the VE if additional jobs could be performed that fit within the given hypothetical.  The customer service job that the vocational expert stated fit within the hypothetical is at odds with the <u>DOT</u>.  Therefore, there are no jobs named in the decision that the Plaintiff can perform.  Alternatively, because the Plaintiff was reduced to a sedentary RFC, has moved into the closely approaching advanced age category during the adjudication of this claim, and cannot perform her past work, she should at least be considered disabled under Grid Rule 201.14.

(Pl.'s Br. at 3-5.)

12

The Commissioner's Response

The Commissioner asserts that the ALJ's finding that Claimant could perform her past relevant work is supported by substantial evidence. (Def.'s Br. at 8-13.) Specifically, the Commissioner argues:

This is a straightforward case of non-disability.

In assessing Gaylean's [sic, Galyean's] allegations that she stopped looking for work because she could not grasp a pen and could not write or type (Tr. 19), the ALJ noted that the objective evidence did not support such extreme allegations based on the following:

(1) Gaylean's treating specialist, Dr. Brar, noted that in May 2008, x-rays of Gaylean's wrist and hands showed only "mild" findings. He also noted that after only three months of medication treatment, Gaylean's condition was "well controlled." Upon follow-up in March 2009, Dr. Brar reduced Gaylean's medication because she was doing well and her condition was "stable." Approximately two months later, Dr. Brar noted reported that Gaylean has normal fine and gross motor ability, normal joints and muscle bulk, and no loss of sensation. Upon Gaylean's one-year follow-up, Dr. Brar noted that Gaylean reported normal activities of daily living and an overall decrease in arthralgia with no significant joint swelling - her examination was within normal limits (Tr. 15, 19...

(2) Gaylean's treatment has been infrequent and only conservative and, more importantly, effective in treating her symptoms which did not last, let alone disable her, for the 12-month statutory period. Gaylean's own testimony revealed that she takes pain medication mostly at night...

(3) the reviewing medical experts, Drs. Lauderman and Franyutti, opined that Gaylean's condition would not preclude work at greater levels of exertion (Tr. 20...

[T]he ALJ also considered other evidence. For example, the ALJ noted that Galyean was never fired or laid off from her jobs due to her medically determinable impairments (Tr. 17). Rather, Galyean stopped working when her temporary job ended in June 2009 due to a division closure (Tr. 18). Indeed, Gaylean applied for DIB only after her unemployment compensation benefits ended and she needed health insurance in order to treat her symptoms (Tr. 18-19)...

Based upon the record as a whole, the ALJ reasonably concluded that

13

Gaylean did not meet her burden of proving that her undifferentiated connective tissue impairment resulted in disabling limitations in the use of her upper extremities. Notwithstanding the above-described mild objective findings that were of brief duration, the ALJ more than gave Gaylean's subjective complaints the benefit of the doubt and reduced her RFC to the sedentary level of exertion, inclusive of an additional restriction to the use of her hands on an occasional basis only (Tr. 8, Finding No. 5). Based upon uncontroverted expert testimony regarding the requirements of Gaylean's past relevant work, the ALJ concluded that Gaylean's RFC did not preclude her from performing the duties of a customer service representative, as Gaylean actually performed it or as generally performed in the economy (Tr. 21, Finding No. 6).

Therefore, Gaylean's assertion that substantial evidence did not support the ALJ's step four finding is without merit....

Similar to Gaylean's failure to prove disabling functional limitations relating to her hands, either for a 12-month continuous period or at all, Gaylean fails to put forth any relevant evidence relating to her challenge to the ALJ's reliance on the VE's testimony (Pl.'s Br. at 4-5)...

First, Gaylean's reliance of SSRs 85-15 and 83-10 are misleading. As Gaylean acknowledges (Pl.'s Br. at 4), these rulings pertain to "significant" limitations and/or "unskilled" sedentary jobs. Id. Here, Gaylean's limitations were not significant and the VE's testimony was not relevant to unskilled jobs (Tr. 45).

Second, the ALJ did not, and was not required to, rely on these Rulings for support of his step four finding. The regulations provide that the ALJ is responsible for determining whether a claimant has the ability to return to her past relevant work and, in so doing, will compare the claimant's work-related limitations with the functional demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(v),.1545, .1560(b)(2). In making this determination, an ALJ will ask about the work a claimant has done in the past and may use the services of a vocational expert to further develop whether a claimant can do the requirements of her past work. Id.; see also SSR 83-12...

In accordance with the regulations, see above, the ALJ provided Gaylean with the opportunity to describe her past work as a customer service representative (Tr. 30, 43). The ALJ further developed the specific requirements of Gaylean's past work by using the services of a vocational expert (Tr. 44). Id. In fact, Gaylean's attorney conceded that the VE was a qualified expert and declined to cross-examine him or challenge his testimony at the time of the hearing (Tr. 44, 46).

Third, Gaylean's reliance on the jobs of insurance clerk and benefits clerk are not relevant, because neither of those jobs were ever discussed by the ALJ or the VE.  Here, the VE made clear that "occasional" limitations with handling would not preclude the performance of a customer service representative's required duties, and Gaylean has offered no evidence to undermine the VE's testimony (Tr. 46)...

Finally, even assuming for the sake of argument that there exists a conflict between the manner in which Gaylean actually performed her specific customer service job or the requirements of that job as described by the <u>DOT</u>, the regulations clearly provide that a claimant is "not disabled" if her work-related limitations do not prevent her from performing the functional demands of her prior occupation as that occupation was performed by the claimant or as that occupation is generally performed in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(v), .1545, .1560(b)(2).  Here, the VE stated that his testimony was not in conflict with the <u>DOT</u> (Tr. 46).  Indeed, as SSR 00-4p...acknowledges, the <u>DOT</u> lists the maximum requirements of occupations and VE testimony need be only "generally" consistent with it.

(Def.'s Br. at 8-13.)

<u>Analysis</u>

In his decision, the ALJ considered the record and made these findings regarding

Claimant's credibility, residual functional capacity [RFC] and ability to perform work:

> **5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she can occasionally climb stairs and ramps, balance, stoop, kneel, crouch and crawl.  She can never climb ladders, ropes or scaffolds.  She must avoid unprotected heights and hazardous machinery.  She can occasionally use her hands for handling, fingering and feeling.  Also, she must avoid concentrated exposure to extremes of heat and cold**...

The claimant testified to extreme symptoms and limitations.  She testified that she sleeps all night and during the day.  She feels like she has the flu.  She has been in flare-up since November 2009 and her immune system is low.  She developed masses in her stomach.  She will be taking prednisone until October.  She has lupus and a blood clotting disorder.  Her height is 5'6" and her weight is 230 pounds.  Prednisone causes her to gain weight.  She stopped working in June 2008 as they closed her division.  She applied for Social Security disability after her unemployment compensation benefits ended and her symptoms worsened.  She had frequent flare-ups with joint

pain and fatigue...Her flare-ups last 30 to 40 days. She is unable to perform secretarial duties as she has difficulty typing and writing. She could not grasp a pen and could not write or type. She also requires a nap during the day.

The objective findings and treatment notes in the record do not support such extreme allegations. As for the claimant's cellulitis complaints, on May 13, 2009, the claimant's abdomen was soft and non-tender without masses (Exhibit 6F). As for the claimant's joint pain complaints, she had a negative rheumatoid factor. On May 29, 2008, nerve entrapment of the upper and lower extremities was absent. Examination was normal of the distal interphalangeal joints, hips, knees, ankles, subtalar joints, midtarsal joints, metatarsal phalangeal joints, thoracic spine, lumbar spine, sacroiliac joints and sternoclavicular/costochondral joints. Trigger/tender points were absent. She had normal muscle strength. On May 31, 2008, the claimant underwent x-rays of the left wrist and bilateral hands. There was no evidence of definite erosive arthropathy. On August 28, 2008, she was reported to be doing well, and her condition was reported to be well controlled. On March 31, 2009, the claimant was doing well and her condition was stable. Her dosage of Hydroxychloroquin was reduced. On June 11, 2009, Gurpreet S. Brar, M.D., reported normal gait and station, fine motor ability, gross motor ability, joints and muscle bulk (Exhibit 3F). On examination of May 13, 2009, the claimant had no loss of sensation. She had normal gait and normal sensation (Exhibit 6F). On August 13, 2009, the gait was normal (Exhibit 16F). On April 6, 2010, the claimant reported her activities of daily living were normal. She reported an overall decrease in arthralgia without significant joint swelling. Her examination was within normal limits (Exhibit 15F).

It is further noted that although claimant alleges severe pain, she testified that she does not take pain medication as directed and takes it mostly at night when her pain is at its worst.

Thus, the claimant is not credible in regard to her physical limitations and this lack of credibility reflects negatively on her credibility in regard to her psychological allegations. The claimant testified that she undergoes no mental health treatment and takes no medication. She felt that Cymbalta was helpful, but she is unable to financially afford it. On August 13, 2009, the claimant's depression was reported to be stable although she was off all medication. On February 17, 2010, the claimant remained off medication, and her depression was improved (Exhibit 16F).

As to effectiveness of treatment, the claimant undergoes no current mental health treatment and the most recent treatment notes indicate improved symptoms even without medication or formal treatment. As to the effectiveness of physical treatment, it has been rather conservative while the

claimant alleges such significant problems that it would be expected that there would be intensification of treatment, which has not occurred.

As to side effects of medication, there are none established that would prevent the claimant from performing her past relevant work.

As to the claimant's activities of daily living, she has at times greatly minimized them, but there is no basis for this in the record.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

As for the opinion evidence, on May 27, 2009, Thomas Lauderman, D.O., a State agency medical expert, reviewed the evidence of record and opined the claimant could lift and carry 50 pounds occasionally and 25 pounds frequently. Dr. Lauderman further opined the claimant could stand and/or walk about six hours and sit about six hours during an eight-hour workday (Exhibit 7F). Dr. Lauderman's opinions are given reduced weight as additional evidence has been submitted since his review of the record that supports greater limitations.

On July 29, 2009, Fulvio Franyutti, M.D., a State agency medical expert, reviewed the evidence of record and opined the claimant could lift and carry 20 pounds occasionally and 10 pounds frequently. He felt she could stand and/or walk about six hours and sit about six hours during an eight-hour workday. He felt she could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. He felt she could never climb ladders, ropes or scaffolds. Dr. Franyutti further opined the claimant must avoid concentrated exposure to extreme cold, extreme heat and hazards, such as machinery and heights (Exhibit 8F). Dr. Franyutti's opinions are entitled to weight to the extent they are consistent with the above residual functional capacity. However, in giving weight to the claimant's allegations, the undersigned finds greater limitations as reflected above.

On August 3, 2009, Bob Marinelli, Ed.D., a State agency medical expert, reviewed the evidence of record and opined the claimant has no severe mental impairment. He felt the claimant had mild restriction of activities of daily living and mild difficulties in maintaining social functioning. Dr. Marinelli further opined the claimant has mild difficulties in maintaining concentration, persistence or pace and has had no episodes of decompensation of extended duration (Exhibit 9F). Dr. Marinelli's opinions

are entitled to significant weight as they are supported by the entire evidence of record.

In sum, the above residual functional capacity assessment is supported by the unimpressive medical findings, the lack of mental health treatment, the claimant's own report of daily activities and the opinions of Drs. Franyutti and Marinelli.

**6.  The claimant is capable of performing past relevant work as a customer service representative.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).**

This job is performed at the sedentary exertional level and requires no greater than occasional climbing of stairs and ramps, balancing, stooping, kneeling, crouching or crawling.  This job requires no climbing of ladders, ropes or scaffolds.  This job does not require working around unprotected heights or hazardous machinery.  This job requires no greater than occasional use of the hands for handling, fingering and feeling.  Also, it does not require working around concentrated exposure to extremes of heat or cold.

In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as actually and generally performed.  This is consistent with the testimony of the vocational expert (SSR 00-4P).

(Tr. at 18-20.)

Credibility Determination

With respect to Claimant's argument that the ALJ wrongfully discredited Claimant's testimony regarding her medical conditions, the court proposes that the presiding District Judge find that the ALJ properly weighed Claimant's subjective complaints of pain in keeping with the applicable regulations, case law, and social security ruling ("SSR") and that his findings are supported by substantial evidence.  20 C.F.R. § 404.1529(b) (2006); SSR 96-7p, 1996 WL 374186 (July 2, 1996); Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

In his decision, the ALJ determined that Claimant had medically determinable

18

impairments that could cause her alleged symptoms. (Tr. at 20.) The ALJ's decision contains a thorough consideration of Claimant's daily activities, the location, duration, frequency, and intensity of Claimant's pain and other symptoms, precipitating and aggravating factors, Claimant's medication and side effects, and treatment other than medication. (Tr. at 18-21.) The ALJ explained his reasons for finding Claimant not entirely credible, including the objective findings, the conservative nature of Claimant's treatment, the lack of evidence of side effects which would impact Claimant's ability to perform her past relevant work, and her broad range of self-reported daily activities. (Tr. at 19-20.)

Residual Functional Capacity [RFC]

Regarding Claimant's assertion that the ALJ erred in assessing Claimant's RFC, the court proposes that the presiding District Judge find that the ALJ assessed Claimant's RFC in keeping with the applicable regulations, case law, and social security ruling ("SSR") and that his findings are supported by substantial evidence. The ALJ generously considered Claimant's subjective complaints and reduced her RFC to the sedentary level of exertion, including adding restriction to the use of her hands to occasional. (Pl.'s Br. at 2-3; Tr. at 8.)

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity (RFC) for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. § 404.1545(a) (2010). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite

your impairment(s)."  Id.  "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments."  Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner.  See 20 C.F.R. § 404.1527(e)(2) (2010).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do.  That is, the SSA need not accept only physicians' opinions.  In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

Contrary to Claimant's assertion that the ALJ erred because he "did not differentiate between how the Plaintiff performed the job and how the job is performed in the national economy," the ALJ specifically found "that the claimant is able to perform it as actually and generally performed" based upon the record and "the testimony of the vocational expert (SSR 00-4P)."  (Pl.'s Br. at 4; Tr. at 21.)  Further, it is noted that the ultimate decision about disability rests with the Commissioner.  20 C.F.R. §§ 416.927(e)(1) and 404.1527(e)(1) (2010).

Vocational Expert

Claimant also asserts that error occurred because "the vocational expert did not provide a DOT code with her analysis of the customer service representative position." (Pl.'s Br. at 4-5.)  In the subject claim, the ALJ posed multiple hypothetical questions to the

vocational expert [VE] and Claimant's representative was given an opportunity to question the VE, which was declined.  (Tr. at 44-47.)  The VE clearly stated that her testimony was consistent with the <u>DOT</u>.  (Tr. at 46.)  Therefore, it is immaterial that a <u>DOT</u> code was not provided.

To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments.  <u>Walker v. Bowen</u>, 889 F.2d 47, 51 (4th Cir. 1989).  While questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record.  <u>See</u> <u>Chrupcala v. Heckler</u>, 829 F.2d 1269, 1276 (3d Cir. 1987).  Additionally, the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe.  <u>Benenate v. Schweiker</u>, 719 F.2d 291, 292 (8th Cir. 1983).

In the subject claim, Claimant's representative accepted the vocational expert and the VE testified that she had sufficient information to allow her to testify regarding Claimant's past work.  (Tr. at 44.)  Further, the hypotheticals posed by the ALJ to the VE fairly set out all of Claimant's impairments.  (Tr. at 45-46.)

<u>GRIDs</u>

Finally, Claimant states that "because the Plaintiff was reduced to a sedentary RFC, has moved into the closely approaching advanced age category during the adjudication of this claim, and cannot perform her past work, she should at least be considered disabled under GRID Rule 201.14.  The undersigned notes that it is true that Claimant was 49 years old at the time of the administrative hearing and has now moved into the closely

approaching advanced age category during the adjudication of this claim.  (Tr. at 28.)  It is also true that Claimant has a high school education and two years of college education.  (Tr. at 28.)  In the past, she worked as a secretary for a federal agency, a hospital, and a church.  (Tr. at 29-30.) She also worked as a health insurance plan customer service representative for a hospital. (Tr. at 30.) The evidence of record does not support that she cannot perform her past work.  GRID Rule 201.14 states that Claimant's previous work experience would have to be "[s]killed or semiskilled - skills not transferable" in order for Claimant to be considered disabled under the GRIDs.  20 C.F.R., Part 404, Subpt. P, App. 2, Rule 201.14 (2011).  In the subject claim, Claimant's skills as a claims representative are transferable.  20 C.F.R., Part 404, Subpt. P, App. 2, Rule 201.15 (2011).

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the presiding District Judge **AFFIRM** the final decision of the Commissioner and **DISMISS** this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de</u>

novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

 April 25, 2012 
      Date

Mary E. Stanley
United States Magistrate Judge